O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYMOND DAVIS MILLER,<br><br>                    Petitioner,<br><br>     v.<br><br>MARCUS POLLARD, Warden,<br><br>                    Respondent. | Case No. 2:20-cv-06690-KES<br><br>MEMORANDUM OPINION AND ORDER |

## I.
## INTRODUCTION

Raymond Davis Miller ("Petitioner") filed a Petition for Writ of Habeas Corpus by a person in state custody pursuant to 28 U.S.C. § 2254 ("Pet."), challenging his 2016 conviction for multiple crimes arising out of two violent confrontations with an acquaintance, David Simington, including assault with a deadly weapon, criminal threats, dissuading a witness, and attempted kidnapping. (Dkt. 1 at 2.[1]) After Respondent moved to dismiss the Petition as partially

---

[1] Except for citations to the Reporter's Transcript ("RT") and Clerk's Transcript ("CT"), page citations refer to pagination imposed by the Court's electronic filing system.

1

unexhausted (Dkt. 16), Petitioner voluntarily dismissed his two unexhausted grounds (Dkt. 26). Respondent then answered the Petition (Dkt. 35) and lodged relevant documents (Dkt. 18, 36). Petitioner replied. (Dkt. 38.) For the reasons discussed below, Petitioner's two remaining claims fail on the merits, and the Petition should be denied.

## II.
## FACTUAL BACKGROUND

The underlying italicized facts are taken from the unpublished California Court of Appeal decision on Petitioner's first direct appeal. (Lodged Document ["LD"] 3); People v. Miller, No. B282284, 2019 WL 1856420, 2019 Cal. App. Unpub. LEXIS 2930 (Cal. Ct. App. Apr. 25, 2019). Unless rebutted by clear and convincing evidence, these facts may be presumed correct. Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir. 2008); 28 U.S.C. § 2254(e)(1).

**A. *August 21, 2015: [Petitioner] Attacked Simington With A Wooden Pole, Causing A Head Injury And Broken Arm***

*[Petitioner] and Simington first met in prison. Thereafter, on August 21, 2015, Simington was fixing his car at the lot where John Schumann kept his motor home. Simington served as Schumann's "kind of" caretaker, because Schumann had a heart condition.*

*At some point while Simington was fixing his car, [Petitioner], accompanied by an unidentified man, arrived at the lot and got into an argument with Simington possibly over drugs. Schumann heard the commotion from inside his motor home, went outside, and hollered that [Petitioner] was not supposed to be on the lot. [Petitioner] struck Simington with a four-foot wooden pole on the back of his head and right arm. Simington saw [Petitioner] strike his arm but not the back of his head. The blows caused Simington's head to bleed and broke his right arm. Simington then attempted to move behind Schumann, at which point [Petitioner] struck Schumann's stomach with the pole and fled.*

*The paramedics and police arrived. Simington told Officer James Clark about the argument and attack. Simington received treatment for his injuries at a hospital.*

*[Petitioner] was arrested and charged with assault and battery.*

*After being released from the hospital, Simington testified about the aforementioned events at the preliminary hearing on the assault and battery charges. We observe that at the preliminary hearing, Simington testified he did not see who hit his arm, but at trial, he testified he saw [Petitioner] hit his arm with a wooden pole. [FN2: At trial, on redirect examination, Simington testified he was mistaken when he testified at the preliminary hearing that he did not see who hit his arm.]*

*About two weeks after the attack and sometime after the preliminary hearing, [Petitioner]'s girlfriend, Toni, approached Simington at the gas station where he was working. She asked him out for a drink and how he was feeling. Simington put her off and said he would call her later, although he never did. About a week later, Toni approached Simington at work again and asked him if he planned to testify against [Petitioner]; Simington said no. Simington thought "something was up" and observed Toni "had a certain look on her face." Simington had no further contact with Toni.*

*B. November 1, 2015: **[Petitioner] Threatened To Take Simington To The Desert To Kill Him And Schumann, But Lawson Intervened And Helped Simington Regain Possession Of His Car Keys***

*In the early morning of November 1, 2015, at about 2:00 a.m., Simington arrived home from work to his apartment building and parked his car in the back alley carport. Someone came to Simington's passenger-side window, looked into the car, and walked off. Upon exiting his car, Simington saw [Petitioner] [FN3: Simington believed [Petitioner] had been released on bail.] and another man, different from the one who had peered into his car, moving quickly toward him.*

*Simington ran. [Petitioner] kicked Simington's legs and tackled him, causing them both to fall to the ground. Simington believed he lost his car keys when he fell and that [Petitioner] or the other man[2] then picked them up.[3]*

*[Petitioner] then picked up a 15-inch knife that had fallen on the ground. [Petitioner] and the other man grabbed Simington. Simington attempted to run away, but could not escape [Petitioner]'s and now the other man's grasp. [Petitioner] told Simington he was going to kill him, raised the knife, and pointed the blade toward Simington while the other man continued to hold Simington. For Simington, "[f]ear took over." The other man grabbed [Petitioner]'s arm and said, "not here."*

*Simington attempted to flee again, and the other man said, "He's not going to go quietly. We've got to do something to him," and "[l]et's just knock him out and take him." [Petitioner] said no, became angry, walked away, and got on his phone. [Petitioner] and the other man then walked Simington southward down the alley while holding on to him. [Petitioner] told the other man to get the truck. The other man walked down the alley southward, in the direction of where the truck would eventually arrive.*

*[Petitioner] told Simington, "you messed up" and "[y]ou never should have testified against me." [Petitioner] also told Simington that (1) he was going to take him to the desert; (2) they were going to talk Schumann into the car and take him to the desert too; (3) Simington was going to dig a hole in which to bury Schumann; and (4) Simington would be "going in right behind" Schumann.*

---

[2] Like the California Court of Appeal, the Court refers to this individual as "the other man."

[3] Simington testified, "They had the keys to my car." (2 RT 691.) When asked how he knew that, he responded, "I guess I fell a couple times . . . . When I went back to the . . . after all that happened at the end I couldn't find my keys." (Id.)

4

*Simington convinced [Petitioner] to allow him to go to his apartment ostensibly to say goodbye to his son. Actually, although Simington had two sons, they were not then at his apartment, and he created this ploy to attempt to seek refuge in his apartment where his two roommates, Lawson and Eddie Peterson, would be. Eventually, [Petitioner] and Simington went to Simington's apartment as [Petitioner] continued to hold Simington "under the arm with his hand." Simington believed [Petitioner] still had the knife. Simington knocked on the apartment door and Lawson opened it.*

*Simington told Lawson to "wake up" and, referring to himself, also told Lawson he was in "bad trouble," "you gotta help me," [Petitioner] and the other man were going to take him to the desert to kill him, and he had lost his car keys.[4] Lawson intervened, causing [Petitioner] to release Simington from his grip.*

*Lawson asked [Petitioner] where Simington's car keys were. [Petitioner] whistled, and the other man arrived and pulled a set of keys from his pocket. The keys did not belong to Simington. Lawson grabbed the other man and told him to "[g]o get [Simington's car] keys."[5]*

*Lawson then went to the alley with [Petitioner] and the other man to retrieve Simington's keys. [FN4: In subsection B below, we set forth additional facts about this event in our discussion of [Petitioner's] sufficiency-of-evidence challenge to*

---

[4] Simington testified (in essence) that he assumed that Petitioner and the other man had the keys to his car, because Simington did not have them after the scuffle. (2 RT 691.) He also testified that he told Lawson that he "lost [his] keys" and that his keys were "missing." (2 RT 701.) Lawson's preliminary hearing testimony, which the jury heard, reflected that Simington told Lawson, "They even got my car keys." (3 RT 946.)

[5] Lawson's preliminary hearing testimony was that Petitioner whistled to summon the other man and that Petitioner then asked the other man for Simington's keys. (3 RT 958.) Simington testified that Lawson demanded Simington's keys from the other man when the other man responded to Petitioner's whistle. (2 RT 701.)

*the theft verdict.[6]] Simington stayed in the apartment. After returning Simington's keys, [Petitioner] and the other man left the scene.*

*About five or 10 minutes later, Simington went to the carport to inspect his car and found it had been ransacked. Simington also noticed a pickup truck idling at, and then departing from the alley's southern end—the same end toward which the other man had forcibly walked Simington after he and [Petitioner] had initially apprehended Simington in the alley.*

*The police arrived, and Simington gave a statement to Deputy Benjamin Casebolt. [Petitioner] was arrested.* (LD 3 at 4-8.)

## III.

## PROCEDURAL HISTORY

Based on the August 21, 2015 attack, the District Attorney charged Petitioner with two counts of assault with a deadly weapon: one count concerning Simington (count 1) and the other concerning Schumann (count 14) (Cal. Pen. Code ("PC") § 245(a)(1)). (1 CT 151, 158.)

Based on the November 1, 2015 events, the District Attorney charged Petitioner with the attempted willful, deliberate, and premeditated murder of Simington (count 3) (PC §§ 664, 187(a)); assault on Simington with a deadly weapon (a knife) (count 4) (PC § 245(a)(1)); dissuading Simington from testifying by force or threat (count 5) (PC § 136.1(c)(1)); making criminal threats against Simington (count 6) (PC § 422(a)); kidnapping Simington (count 7) (PC § 207(a)); two counts of conspiracy to commit murder (counts 8 and 9) (PC §§ 182(a)(1), 187(a)); conspiracy to kidnap Simington (count 10) (PC §§ 182(a)(1), 207(a)); second degree robbery of Simington's personal property (count 11) (PC § 211); and

---

[6] The Court sets out these additional facts in its analysis of Petitioner's insufficiency of evidence claim.

6

first degree burglary (count 13) (PC § 459).[7] (1 CT 148-159.)

The jury found Petitioner guilty of three counts of assault with a deadly weapon (counts 1, 4, and 14), dissuading a witness from testifying (count 5), criminal threats (count 6), attempted kidnapping[8] (count 7), conspiracy to kidnap (count 10), petty theft[9] (count 11), and burglary (count 13). (1 CT 197-203, 206-10.) The jury found Petitioner not guilty of conspiracy to commit murder (counts 8 and 9). (1 CT 204-05.) The trial court declared a mistrial on attempted murder (count 3) because the jury could not reach a unanimous verdict on that charge. (4 RT 2414.)

Petitioner appealed. (LD 5, 6, 7.) The Court of Appeal affirmed his convictions but reversed three 1-year sentence enhancements and remanded the case for re-sentencing. (LD 3.)

On remand, the trial court vacated the sentence, struck the three enhancements, and resentenced Petitioner to 17 years in state prison rather than 20. (LD 4.) Petitioner again appealed. Petitioner's appellate counsel filed a brief pursuant to People v. Wende, 25 Cal.3d 436 (1979), and requested that the Court of Appeal independently review the record. (LD 8.) The Court of Appeal found no error and affirmed the judgment. (LD 9.)

Petitioner never filed a petition for review at the California Supreme Court in either of his direct appeals. Instead, Petitioner accomplished exhaustion by filing a

---

[7] The District Attorney's Office charged Petitioner with two other crimes that it ultimately did not bring to trial: battery with serious bodily injury (PC § 243(d)) (count 2) and conspiracy to dissuade a witness from testifying by force or threat (PC §§ 136.1(c)(1), 182(a)(1)) (count 12). (See 1 CT 81, 87.)

[8] The jury found Petitioner not guilty of the greater crime of actual kidnapping. (1 CT 202.)

[9] The jury found Petitioner not guilty of the greater crime of second degree robbery. (1 CT 207.)

habeas petition with the California Supreme Court (LD 10) that was summarily denied in February 2020 (LD 11).

## IV.
## CLAIMS

Ground Two: Appellate counsel provided ineffective assistance of counsel ("IAC") by failing to file a petition in the California Supreme Court for review raising the claims raised unsuccessfully on initial direct appeal. (Pet. at 5, 12-13.)

Ground Three: There is insufficient evidence to support Plaintiff's conviction on count 11 for petty theft. (Id. at 5, 13-14.)

## V.
## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Petitioner is entitled to habeas relief only if the state court's decision on the merits "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

The relevant "clearly established Federal law" consists of only Supreme Court holdings (not dicta), applied in the same context to which the petitioner seeks to apply it, existing at the time of the relevant state court decision. Premo v. Moore, 562 U.S. 115, 127 (2011). A state court acts "contrary to" clearly established Federal law if it applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts. Price v. Vincent, 538 U.S. 634, 640 (2003). A state court "unreasonably appli[es]" clearly established federal law if it engages in an "objectively unreasonable" application to the facts of the correct governing legal rule. White v. Woodall, 572 U.S. 415, 425

(2014) (rejecting previous construction of section 2254(d) that a state court decision involves an unreasonable application of clearly established Supreme Court law if the state court "unreasonably refuses to extend a legal principle to a new context where it should apply"). Habeas relief may not issue unless "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [the United States Supreme Court's] precedents." Harrington v. Richter, 562 U.S. 86, 103 (2011). "[T]his standard is 'difficult to meet,'" Metrish v. Lancaster, 569 U.S. 351, 358 (2013), as even a "strong case for relief does not mean the state court's contrary conclusion was unreasonable," Richter, 562 U.S. at 102.

## VI.

## DISCUSSION

A. **CLAIM TWO: IAC.**

**1. The Relevant State Court Decision.**

For purposes of applying AEDPA deference, the relevant state court decision is the last reasoned decision, if any. Ylst v. Nunnemaker, 501 U.S. 797, 806 (1991).

Here, Petitioner first presented an IAC claim to the California Supreme Court in his habeas petition. (LD 10 at 7, 46 [letter from counsel confirming he did not file a petition for review].) Specifically, Petitioner argued that his counsel on direct appeal failed to "raise the enclosed claims." (Id. at 7.) The two "enclosed" claims in his state habeas petition were (1) that the trial court erred in overruling defense counsel's objections to hear any portions of Lawson's preliminary hearing testimony (id. at 4-5), and (2) insufficient evidence to support petty theft (id. at 6)—i.e., the two claims raised unsuccessfully on direct appeal. (See LD 3 at 11-20.)

The California Supreme Court denied the claim without explaining its reasoning. (LD 11.) When faced with an unexplained denial, federal courts applying AEDPA must independently consider whether any reasonably grounds exist on which the state court could have denied the claim. Richter, 562 U.S. at 98,

9

102; Murray v. Schriro, 882 F.3d 778, 802 (9th Cir. 2018).

**2. The California Supreme Court's Denial Had A Reasonable Ground.**

There is no right to counsel on discretionary appeals. Pennsylvania v. Finley, 481 U.S. 551, 555 (1987). In California, after the first appeal, direct review occurs only at the California Supreme Court's discretion. See Douglas v. California, 372 U.S. 353, 356 (1963); People v. Scott, 64 Cal. App. 4th 550, 558 n.6 (1998). Where no constitutional right to counsel exists, there can be no claim of ineffective assistance. Wainwright v. Torna, 455 U.S. 586, 587-88 (1982). Petitioner, therefore, cannot pursue an ineffective assistance claim based on his appellate counsel's failure to file a petition for review. See Lennan v. Janda, No. CV 12-4510-JLS (JEM), 2015 U.S. Dist. LEXIS 167086, at *45 (C.D. Cal. Aug. 4, 2015); Hollins v. Jaime, No. SACV 19-2487-FMO (KS), 2020 WL 2066141, at *6 (C.D. Cal. Apr. 8, 2020) ("Because Petitioner had no constitutional right to appellate counsel for discretionary review by the California Supreme Court, he could not have been deprived of effective assistance by his appellate counsel's failure to file a timely request for review in that court."). The California Supreme Court's denial of Petitioner's IAC claim was therefore reasonable, and Petitioner does not warrant habeas relief on this claim.

**B.   CLAIM THREE: Insufficiency of the Evidence.**

**1. The Relevant State Court Decision.**

Petitioner first presented this claim on direct appeal. (LD 5.) He then presented it to the California Supreme Court in his habeas petition (LD 10 at 29, 40) and received an unexplained denial (LD 11).

When the California Supreme Court issues an unexplained decision after a lower court has issued a reasoned decision, the reviewing federal court "looks through" the unexplained decision, presuming that the California Supreme Court denied relief on the same factual and legal grounds as the lower court. Ylst, 501 U.S. at 804. Thus, for purposes of applying AEDPA deference, the relevant state

court decision is the reasoned decision of the Court of Appeal.  (LD 3.)

**2. Clearly Established Federal Law.**

Under <u>Jackson v. Virginia</u>, in determining a due process claim based on the sufficiency of the evidence, "the critical inquiry ... is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 318 (1979).  In undertaking collateral review of a state court decision rejecting a claim of insufficiency of the evidence pursuant to 28 U.S.C. § 2254(d)(1), the inquiry is "even more limited"; federal courts "ask only whether the state court's decision was contrary to or reflected an unreasonable application of <u>Jackson</u> to the facts of a particular case."  <u>Emery v. Clark</u>, 643 F.3d 1210, 1213-14 (9th Cir. 2011) (citing <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274-75 (9th Cir. 2005)). The relevant inquiry is made in light of the applicable state law.  <u>Jackson</u>, 443 U.S. at 324 n.16; <u>see also</u> <u>Emery</u>, 643 F.3d at 1214 ("Insufficient evidence claims are reviewed by looking at the elements of the offense under state law.").

**3. The California Court of Appeal's Decision.**

The Court of Appeal began by summarizing Petitioner's briefing as arguing that "the evidence supporting the jury's guilty verdict on the petty theft charge (count 11) was insufficient because there was no evidence that [Petitioner] intended to steal Simington's car keys, [Petitioner] knew or reasonably expected that the other man who accompanied him would steal the keys, or anyone took the keys from Simington."  (LD 3 at 17; <u>see also</u> LD 5 at 29-31.)

Next, the court summarized the elements of petty theft, relying on CALCRIM 1800, the pattern jury instruction given to Petitioner's jury (2 CT 228), as follows:

> The elements of theft are: The defendant (1) took possession of property owned by someone else; (2) took the property without the owner's consent; (3) when taking the property, intended to deprive the

| | |
|---|---|
| 1 | owner of it permanently or to remove it from the owner's possession |
| 2 | for so extended a period that the owner would be deprived of a major |
| 3 | portion of the value or enjoyment of the property; and (4) moved the |
| 4 | property, even a small distance, and kept it for any period of time, |
| 5 | however brief. (CALCRIM No. 1800.) |

(LD 3 at 18.)

The court then summarized the evidence that would support a finding on each disputed element, as follows:

> Lawson testified at the preliminary hearing about the events surrounding Simington's car keys, which testimony was read back at trial, as follows.[10] When Simington first arrived at the apartment with [Petitioner] and saw Lawson, Simington "said that they even got my car keys." [3 RT 946.] At some point after Simington went into the apartment, [Lawson] and Simington were asking [Petitioner] about the whereabouts of Simington's car keys. [Petitioner] then whistled, the other man came, and [Petitioner] asked the other man for Simington's keys. [3 RT 949.] The other man produced keys but not Simington's. [3 RT 958.] Lawson, [Petitioner], and the other man went outside to the carport area in the alley behind Simington's apartment building, where the other man went into one of the carport stalls [about five or six stalls away] and returned about a minute later with Simington's keys. [3 RT 958-59.]
>
> At trial, Simington testified about the events concerning the keys as follows. Simington arrived home from work in his car, which

---

[10] Lawson died after the preliminary hearing but before trial. Because he was "unavailable," his preliminary hearing testimony was read to the jury. (3 RT 937-38, 1589.)

12

he parked in the alley behind his apartment building. [3 RT 918.]
After [Petitioner] initially tackled Simington in the alley, brandished a
knife, and with the other man, grabbed Simington and walked him
down the alley, Simington could not find his keys.[11] [2 RT 689-91.]
Simington then persuaded [Petitioner] to let him go to his apartment,
and Lawson appeared. [2 RT 695-98.] When the other man came to
the apartment, Lawson grabbed him and said "come here" and "[g]o
get his keys." [2 RT 701.] Simington stayed in the apartment while
Lawson, [Petitioner], and the other man retrieved his keys from the
carport. [2 RT 702.]

Lawson's and Simington's chronological accounts of the events
support a reasonable inference that Simington dropped his keys when
[Petitioner] initially chased him down the alley, and that [Petitioner]
himself or through the other man then took physical possession of
Simington's keys from the alley floor. [Petitioner] and Simington's
earlier physical altercation, the threats to kill Simington that
[Petitioner] made in the alley, [Petitioner]'s attempt to give Simington
the wrong keys at Simington's apartment, and the presence of the

---

[11] At the preliminary hearing, Simington testified that he had placed the keys on the passenger seat after removing them from the ignition. (2 CT 310-11.) It is unclear what he did with them afterward, if anything. He also testified at the preliminary hearing that "the black guy" accompanying Petitioner "ransack[ing]" the car after "g[e]t[ting]" Simington's "keys," but then said, "You know, I don't know what he did. I wasn't there." (2 CT 323.) Neither the prosecution nor Petitioner's counsel sought to introduce this portion of Simington's preliminary hearing testimony as evidence in the trial. In evaluating a sufficiency of the evidence claim, courts consider only the "record evidence" considered by the jury. See Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) ("[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'").

knife all support an inference that Simington never consented to [Petitioner]'s taking his keys.

That evidence also supports a reasonable inference that [Petitioner] intended to deprive Simington of his keys permanently or for an extended period so as to deprive Simington of a major portion of the value or enjoyment of his keys. This inference is especially true because by taking the keys, [Petitioner] impeded Simington's ability to escape. Finally, the facts that (1) the other man retrieved Simington's keys from a place different from where Simington dropped them, and (2) Simington's car was ransacked between the time he "lost" his keys and [Petitioner] and the other man returned them at Lawson's insistence [2 RT 702] support a reasonable inference that [Petitioner] moved the keys and maintained possession of them for some time. Therefore, the evidence adduced at trial was sufficient to support each element of theft.

[Petitioner] also argues that the evidence of his intent to deprive Simington of his car keys was insufficient because (1) Simington testified that he told Lawson he had "lost" his keys, negating an inference that [Petitioner] wanted to take Simington's keys, (2) the other man shortly thereafter returned the keys to Simington, and (3) [Petitioner] and the other man had their own cars and were without a third accomplice who could have simultaneously operated Simington's car. By these contentions, [Petitioner] asks us to draw inferences contradicting those the jury drew. The substantial evidence standard of review does not permit us to do so.

(LD 3 at 18-20.)

**4. The California Court of Appeal Reasonably Denied this Claim.**

The Court is skeptical of some of the California Court of Appeal's factual

14

conclusions. For example, it found that the man retrieved Simington's keys "from a place different from where Simington dropped them." (LD 3 at 20.) Yet Simington did not know exactly when or where the keys left his possession, and the carport area (where the keys were found) was along the alley where the initial scuffle occurred. The California Court of Appeal also attributes some actions to Petitioner that the evidence does not support. The court found that Petitioner attempted to give Simington the wrong set of keys (id. at 19), but there is no indication that Petitioner intended the other man to give Simington the <u>wrong</u> keys—especially given that, according to Lawson, Petitioner then instructed the other man to go retrieve the correct keys.

Nonetheless, even if the Court found that the state court based its decision on an unreasonable determination of the facts—warranting de novo review (see <u>Hurles v. Ryan</u>, 752 F.3d 768, 778 (9th Cir. 2014))—the Court would still deny Petitioner's claim. The evidence could have supported multiple versions of events. It is possible, maybe even likely, that Simington dropped the keys; his car was unlocked, permitting Petitioner or the other man to "ransack" it; and the other man found Simington's keys fortuitously in the carport area. Still, one of the versions of events supported by the evidence is the version that the jury accepted.[12] Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact <u>could</u> have found that Petitioner took possession of Simington's car keys (the primary element in dispute, as in these circumstances the other elements follow from this one[13]). Petitioner had a motive to take the keys—i.e., preventing

---

[12] Notably, the jury rejected the second degree robbery charge (which required that Petitioner took the keys from Simington's person, by force or fear or to prevent Simington from resisting) and the lesser-included grand theft charge (which required that theft was from Simington's person), opting instead for petty theft. (4 RT 1857-60, 2423.)

[13] If Petitioner did in fact take the keys, then it would have likely involved moving the keys, without Simington's consent, and with the intent to deprive

15

Simington's escape. Petitioner or the other man had the opportunity to take the keys—i.e., during the scuffle or shortly thereafter. Circumstantial evidence supported the notion that Petitioner—or, at his instruction or with his knowledge and support, the other man[14]—took Petitioner's keys either from Petitioner's car or from the ground, and later dropped them or placed them in the carport area. When Lawson told Petitioner to return Simington's keys, Petitioner did not protest—"What keys? We didn't take his keys!"—but instead whistled for the other man and asked him for the keys, suggesting that Petitioner knew that the other man was responsible. Nor did the other man protest—"What keys?"—but instead reached in his pocket for keys. When Simington disclaimed the produced keys, the other man led Lawson directly to the place where the keys were and produced them a mere minute later, suggesting that he had remembered (or had always known) where the keys had been placed. Further, the car was ransacked (although granted it is unclear whether the car was locked at the time). This is not overwhelming evidence, but nor is it so flimsy that <u>no</u> rational trier of fact could have convicted Petitioner.

/ / /

/ / /

/ / /

---

Simington of the enjoyment of the keys. Even kicking the keys away so that Simington could not reach them—i.e., so that they were under Petitioner's control and not Simington's—might support a petty theft conviction. For example, the jury was instructed, "A person does not have to actually hold or touch something to possess it. It is enough if the person has control over it or the right to control it, either personally or through another person." (4 RT 1859.)

[14] The trial court instructed the jury on aiding and abetting, because "the other individual involved ended up with the keys." (3 RT 1558; <u>see also</u> 3 RT 1581 [prosecutor telling jury, "it doesn't matter which of them took the keys because we have something in the law called aiding and abetting"]; 4 RT 1827-28.)

16

# V.
# CONCLUSION

Based on the foregoing, the Court directs that judgment be entered denying the Petition on the merits.

DATED: July 14, 2021

_____
KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE